UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA, ex     )
rel. CONSTANCE A. CONRAD,        )
                                 )
    Plaintiffs,                  )
                                 )       Civil Action
                                 )       No. 02-11738-RWZ
vs.                              )
                                 )
ABBOTT LABORATORIES, INC.,       )
et al.,                          )
                                 )
    Defendants.                  )



**MOTION HEARING**



BEFORE THE HONORABLE RYA W. ZOBEL
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
November 8, 2012
2:30 p.m.


*   *   *   *


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

```
1    APPEARANCES:

2
     For the Relator:
3
     BAILEY & GLASSER LLP
4    By:  John J. Roddy, Esq., and
          Elizabeth A. Ryan, Esq.
5         125 Summer Street
          Suite 1030
6         Boston, MA 02110

7    -and-

8    MEEHAN, BOYLE, BLACK & BOGDANOW, P.C.
     By:  Leo V. Boyle, Esq.
9         Two Center Plaza
          Suite 600
10        Boston, MA 02108-1908

11

12   For the Defendants Duramed Pharmaceuticals, Inc., Goldline
     Laboratories, Inc., and Teva Pharmaceuticals USA, Inc.:
13
     SHERIN and LODGEN LLP
14   By:  Sara Jane Shanahan, Esq., and
          Elizabeth A. Rice, Esq.
15        101 Federal Street
          Boston, MA 02110
16
     -and-
17
     KIRKLAND & ELLIS LLP
18   By:  Jay P. Lefkowitz, P.C., and
          Devora W. Allon, Esq.
19        601 Lexington Avenue
          New York, NY 10022
20
     -and-
21
     KIRKLAND & ELLIS LLP
22   By:  John P. Del Monaco, Esq.
          Citigroup Center
23        153 East 53rd Street
          New York, NY 10022-4611
24

25
     (Appearances continued on the next page.)
```

APPEARANCES:   (Cont'd)


For the Defendant Abbott Laboratories, Inc.:

KIRKLAND & ELLIS LLP
By:  Gabor Balassa, Esq.
     300 North LaSalle
     Chicago, IL 60654


For the Defendants Cypress Pharmaceutical, Inc.,
and Hawthorn Pharmaceuticals, Inc.:

CHOATE HALL & STEWART LLP
By:  James W. Evans, Esq.
     Two International Place
     Boston, MA 02110


For the Defendant Healthpoint, LTD:

COVINGTON & BURLING LLP
By:  Ronald G. Dove, Jr., Esq.
     1201 Pennsylvania Avenue, NW
     Washington, DC 20004-2401


For the Defendant Mylan, Inc.:

MORRISON & FOERSTER LLP
By:  Robert A. Salerno, Esq.
     2000 Pennsylvania Avenue, NW
     Suite 6000
     Washington, DC 20006-1888




(Appearances continued on the next page.)

```
 1     APPEARANCES:  (Cont'd)

 2

 3     For the Defendant Pamlab, L.L.C.:

 4     AKIN GUMP STRAUSS HAUER & FELD LLP
       By:  Robert S. Salcido, Esq.
 5          Robert S. Strauss Building
            1333 New Hampshire Avenue, N.W.
 6          Washington, DC 20036-1564

 7

 8
       For the Defendant United Research Laboratories, Inc.:
 9
       COOLEY LLP
10     By:  Mazda K. Antia, Esq.
            4401 Eastgate Mall
11          San Diego, CA 92121-1909

12

13
       For the Defendant The Harvard Drug Group, LLC:
14
       ARENT FOX LLP
15     By:  Brian D. Schneider, Esq.
            1050 Connecticut Avenue, NW
16          Washington, DC 20036-5339

17

18
       For the Defendant Watson Laboratories, Inc. - Florida:
19
       K&L GATES LLP
20     By:  Jason L. Drori, Esq.
            State Street Financial Center
21          One Lincoln Street
            Boston, MA 02111-2950
22

23

24

25
```

1              P R O C E E D I N G S

2          (The following proceedings were held in open court

3  before the Honorable Rya W. Zobel, United States District Judge,

4  United States District Court, District of Massachusetts, at the

5  John J. Moakley United States Courthouse, 1 Courthouse Way,

6  Boston, Massachusetts, on November 8, 2012.)

7          THE COURT:  Good afternoon.  Please be seated.

8          COURTROOM DEPUTY CLERK URSO:  This is the United

9  States versus Mid-Atlantic, Civil Action No. 02-11738.  If

10 counsel could identify themselves, please, for the record.

11         MR. LEFKOWITZ:  Jay Lefkowitz for the defendants,

12 and arguing for the group of defendants in the primary motion

13 to --

14         THE COURT:  Now, whom do you represent?

15         MR. LEFKOWITZ:  I represent Teva --

16         THE COURT:  Because my list is by defendants and by

17 plaintiffs.

18         MR. LEFKOWITZ:  I represent Teva Pharmaceuticals and

19 a couple of the subsidiaries, Goldline Laboratories as well

20 and Duramed Pharmaceuticals.

21         THE COURT:  Wait one second.  I need to organize

22 this.  We have pages and pages of lawyers.

23         (Pause.)

24         THE COURT:  Okay.  It's not Abbott, right?

25         MR. LEFKOWITZ:  No.  It's -- starting at the top of

1    the caption, the first one I have as mine is Duramed.

2              THE COURT:  Got you.  Mr. Lefkowitz, right?

3              MR. LEFKOWITZ:  Correct.  And then three down from

4    Duramed, I'm also representing Goldline.

5              THE COURT:  That's okay.  I only need the one.

6              MR. LEFKOWITZ:  Okay.  Thank you, your Honor.

7              THE COURT:  How about you?

8              MR. DEL MONACO:  John Del Monaco, with the same firm

9    as Mr. Lefkowitz and the same defendants.

10             THE COURT:  Del Monaco.  Okay.  Got it.

11             MR. DOVE:  I'm Ronald Dove, your Honor.  I represent

12   Defendant Healthpoint and a number of the other defendants,

13   but I'm here to argue the second motion, Healthpoint's motion

14   to dismiss.

15             THE COURT:  How come we have so many motions to

16   dismiss again and again and again by the same defendants?

17             MR. DOVE:  Your Honor, this is our second motion.

18   Our first motion was in the case brought by the United States

19   and this is our first motion in this case.

20             MR. RODDY:  John Roddy for --

21             THE COURT:  Wait a minute.  I was looking for

22   Healthpoint.  I know you guys only got 15 minutes to argue,

23   but I have at least half an hour to find you.

24             (Pause.)

25             THE COURT:  Mr. Dove, I found you.

1          MR. RODDY:  John Roddy, Bailey & Glasser for the

2  relator.  I will be arguing.  With me is --

3          MS. RYAN:  Elizabeth Ryan.  Good afternoon, your

4  Honor.

5          MR. BOYLE:  Good afternoon, your Honor.  Leo Boyle --

6          THE COURT:  Hold it.  Hold it.

7          I'm sorry, you are Mr.?

8          MR. RODDY:  Roddy, your Honor, for the relator.

9          THE COURT:  Why don't I find you?

10          COURTROOM DEPUTY CLERK URSO:  Did you find him,

11  Judge?

12          THE COURT:  Okay.  I have Mr. Roddy.  And you are?

13          MS. RYAN:  Good afternoon, your Honor.  Elizabeth

14  Ryan, also with Bailey & Glasser.

15          THE COURT:  Okay.

16          MR. BOYLE:  Good afternoon, your Honor.  Leo Boyle,

17  also for the relator.

18          THE COURT:  Got you.

19          Now, anybody else who is arguing?

20          MR. EVANS:  Good afternoon, your Honor.  James Evans

21  for Cypress and Hawthorn.

22          THE COURT:  But you're not arguing?

23          MR. EVANS:  We do have a motion to dismiss, your

24  Honor.

25          THE COURT:  Well, I understand that, but not a

1    separate one?

2         MR. EVANS:  No.  It is an individual one and it was

3    noticed for the hearing today.

4         THE COURT:  Who is your client?

5         MR. EVANS:  Cypress and Hawthorn.

6         THE COURT:  Hybrid, did you say?

7         MR. EVANS:  Hawthorn and Cyprus.

8         (Discussion off the record at the Bench.)

9         COURTROOM DEPUTY CLERK URSO:  Was your motion dealt

10   with?

11        MR. EVANS:  I believe it's still outstanding.  It's

12   Docket No. 326 and I know that --

13        THE COURT:  I think that was done.

14        COURTROOM DEPUTY CLERK URSO:  Yes.

15        MR. RODDY:  Your Honor, I don't have the docket or

16   the document in front of me, but I believe it was with respect

17   to certain discrete drugs and the relator had agreed to

18   dismiss the claims against those particular drugs.  I did not

19   think that was on for today.

20        THE COURT:  Yes, I didn't either.  So, did that

21   happen?  Did the relator, in fact, dismiss as to those drugs?

22        MR. RODDY:  The relator filed a response that said we

23   will dismiss as to those drugs, and I believe that was entered

24   on the docket and I honestly can't recall.  Procedurally it

25   was quite a number of months back.

```
1              THE COURT:  I think under the circumstances we will
2    pass that motion since we think it's already gone.
3              MR. EVANS:  Thank you, your Honor.
4              THE COURT:  Thank you.  Anybody else?
5              (No response.)
6              THE COURT:  Okay.  Now, what we have is a
7    consolidated motion by defendants to dismiss the tenth amended
8    complaint.  There is a separate little supplemental one by
9    Abbott Laboratories with its own special, and then there is
10   Healthpoint's motion to dismiss.  Those are the only motions
11   that I'm aware of that we are to hear today; is that correct?
12             MR. BALASSA:  Your Honor, Gabor Balassa for Abbott
13   Laboratories.
14             We did not understand our motion was being heard
15   today and we understood that the relator had dismissed
16   complaints with respect to the products that were at issue in
17   our separate motion to dismiss.
18             THE COURT:  So, that's finished now?
19             MR. RODDY:  That's correct.  Again, your Honor, I
20   believe it was one or two discrete products out of the entire
21   range and those were enumerated in relator's response to
22   Abbott's motion to dismiss saying we would not contest that
23   motion to dismiss.
24             THE COURT:  So, that is No. 335.  And the parties
25   agree that these particular products are not implicated in any
```

1    wrongdoing?

2              MR. RODDY:  Yes, your Honor.

3              THE COURT:  Okay.

4              Does that mean that Abbott is also out of the joint

5    motion?

6              MR. BALASSA:  No, your Honor.  We have other products

7    that are part of the joint motion.

8              THE COURT:  Okay.  So, I guess we go to Mr. Lefkowitz

9    for the joint motion.

10             MR. LEFKOWITZ:  Thank you, your Honor.

11             THE COURT:  And then Healthpoint for its separate

12   motion, right?

13             MR. DOVE:  Correct, your Honor.

14             MR. LEFKOWITZ:  So, good afternoon, your Honor.

15             In light of the window of time that we have this

16   morning -- this afternoon, if the Court would permit --

17             THE COURT:  You don't get charged with the time that

18   I have spent trying to find you.

19             MR. LEFKOWITZ:  That's quite all right.

20             I think I can make my argument in about eight or nine

21   minutes, maybe ten, and then I'd to just be in a position to

22   stand up at the end and respond for just about two minutes, if

23   I may.

24             In addition, because there's been extensive briefing

25   here, I'm going to focus on what I think are the most critical

1   things that have not necessarily been elucidated in the

2   briefing.

3        Number one, I want to just make a few key points and

4   show you a couple of things with respect to the jurisdictional

5   issue, the public disclosure bar, and then I'd like to make

6   one or two points that arise out of the *Organon* and the

7   *Healthpoint* decisions that your Honor has issued since the

8   briefing and we'll rest on our motion with respect to

9   everything else.

10        Just very briefly, Ms. Conrad is alleging that the

11   defendants caused states to submit false claims to the Federal

12   Government by falsely representing that certain products were

13   eligible for federal reimbursement and that then the states

14   reimbursed drugstores for those purchases and then requested

15   matching federal funds.  That's the essence of the alleged

16   fraud.

17        Now, from a jurisdictional perspective, as your Honor

18   knows well, because Ms. Conrad doesn't claim to be an original

19   source, there's no jurisdiction if there was a prior public

20   disclosure of the facts on which her allegations are based,

21   and as you made clear most recently in *Organon*, the first test

22   in the First Circuit is whether the essential elements

23   exposing the particular transactions as fraudulent find their

24   way into the public domain, and you explain that that happens

25   when both the alleged misrepresented state of facts and the

1    alleged true state of facts are publicly available.  So, what

2    I want to do for just the next few minutes is show you exactly

3    how that's the case publicly.

4           And if I may, I want to take a first look at what

5    I've highlighted here, which is one of the publicly-available

6    sources.  This is a selection of what you would see if you

7    went online to the CMS, the government center for Medicaid

8    services, Medicaid and Medicare services database.  This is a

9    drug product data report.  I'll wait until the -- if the Court

10   would like, I have a -- I can give the Court a hand-up like

11   this.

12          THE COURT:  Turn on the public one.

13          COURTROOM DEPUTY CLERK URSO:  It should be on.  It

14   was on and then they said something happened.

15          THE COURT:  My monitor isn't going on.

16          COURTROOM DEPUTY CLERK URSO:  Your monitor?

17          THE COURT:  With which I decide what you get to see.

18          MR. LEFKOWITZ:  I have a hand-up if that would be

19   easier.

20          THE COURT:  No.  I was trying to show it on the big

21   screen so that everybody in the courtroom could see what

22   you're doing.

23          COURTROOM DEPUTY CLERK URSO:  It's on.  I don't know

24   why it's not coming on.

25          (Discussion off the record.)

1          THE COURT:  Well, we'll have to proceed as we --

2          MR. LEFKOWITZ:  Okay.  May I hand up a hardcopy?  I

3     don't need it.  I can see the screen.  Can you see it as well?

4     Okay.

5          If I may, your Honor.  So, what I want to show you

6     here is the first of the three different core set of

7     publicly-available documents that would allow anyone -- and I

8     was able to do this literally from my iPad -- to find the

9     relevant information that would disclose both the false set of

10    facts and the true state of events.  This is what --

11         THE COURT:  Now, what's the date of this report?

12         MR. LEFKOWITZ:  This report is basically a current

13    report.  You can -- it's updated all the time and, of course,

14    you can find out historical by going to the hardcopies.

15         This shows what drugs a company -- in this case I

16    took Teva Pharmaceuticals -- has listed as a covered

17    outpatient drug for purposes of getting reimbursement, and I

18    have simply taken one line here and I've highlighted to

19    demonstrate that by looking at this data, you could see that a

20    called drug called Zolpidem, which is -- happens to be the

21    generic of Ambien, the sleeping pill, was submitted by Teva

22    Pharmaceuticals to the states for purposes of reimbursement

23    under Medicaid.

24         Now, if I go to the next slide, this is a different

25    federal document.  This is the CMS drug utilization data

1    report, and what this shows is that with respect to the state

2    of Massachusetts over in the left-hand column, it refers to

3    Zolpidem, the same drug product.  It has the NDC code and it

4    goes to the right and it shows that the amount Medicaid

5    reimbursed to Massachusetts in that particular period of time

6    was $4464.

7           So, what I now know from these two data sources is

8    that Teva submitted coded Zolpidem as an eligible drug and

9    that the state did what you'd expect it to do, which was cover

10   it.

11          Now, if, in fact, Ms. Conrad's theory of fraud were

12   true, you would be able to go to another database and figure

13   out whether or not this is fraudulent or not.

14          Now, there's a database called the Orange Book.  This

15   is the Federal Government's, the FDA's listing of all

16   authorized and approved drugs.  And here what we have is,

17   because Zolpidem is an approved drug, you can go into a

18   drugstore and get it, you actually see -- and I've blown up a

19   little copy of that page.  You'd see that Zolpidem on the

20   right-hand side is in the Orange Book, but if you looked in

21   the Orange Book for a product that was on the first two lists,

22   represented by the company as a drug and reimbursed and you

23   didn't find Zolpidem, you would be able to make your alleged

24   case of a fraud.  And, indeed, the plaintiffs have argued that

25   there are certain vitamins and minerals and supplements, and

1   whatever, that are not listed in the official list of

2   government drugs and, yet, we've submitted for reimbursement

3   and have been paid.

4           This is the essence of having public sources

5   available, and it's no surprise that this is how Ms. Conrad

6   found this, because she's not a typical whistle-blower.  She

7   didn't work for one of the companies.  She didn't have inside

8   information.  In fact, she worked for the government.  She

9   worked for the Medicaid organization in healthcare.  She's

10  effectively like an expert for the government.

11          Now, one argument that the plaintiff -- the relator

12  makes here is she says, Well, the Orange Book only tells you

13  what is a drug.  It doesn't actually tell you what isn't a

14  drug and, therefore, it's not really a public source.

15          That's kind of like saying if you were trying to

16  identify voter fraud in the election and you wanted to see if

17  someone was not a registered voter, that you wouldn't be able

18  to use the list of registered voters.  You'd have to go to a

19  list of non-registered voters and, obviously, we don't have

20  such lists.  The way you determine if a voter is not

21  registered is you see if he's on the list to vote, registered

22  voters, in the same way that if you want to know whether a

23  drug is not allowable, not approvable, not reimbursable, is

24  you see if it's not on the Orange Book.

25          Now, I would suggest, your Honor, that this is

1    exactly the kind of publicly-available information that is

2    appropriate.  In *Organon*, you found that the public disclosure

3    bar did not block the case with respect to off-label marketing

4    because the FDA warning letters did not even concern the

5    fraudulent conduct at issue, and then when the defendant said,

6    But there's lots of claims data that they could have looked

7    at, you said in your opinion, But I don't even know what the

8    claims data relates to.  I don't know what the information is.

9    It's not defined, but here it's very defined.

10         So, in the wake of this publicly-available

11   information, what are the other two arguments that the relator

12   makes?  Number one, she says, Well, the First Circuit has a

13   very, very narrow view of what administrative reports are, and

14   these are not administrative reports.

15         Well, with respect, she's wrong about that.  In fact,

16   the First Circuit was part of a circuit split between the

17   First Circuit and the Ninth Circuit on the very subject of

18   what these reports are.  And in *Ondis*, what the Court said was

19   even responding to a FOIA request, which is a government

20   official literally responding to a document request and piling

21   up a bunch of documents and handing it to the other side, even

22   that constitutes an administrative report.

23         It doesn't require, as the relator suggests, any kind

24   of analysis or synopsis.  That's precisely what the Ninth

25   Circuit had said, and the First Circuit in *Ondis* had disagreed

1    and the Supreme Court broke the tie in *Schindler* and in

2    *Schindler* the Supreme Court made very clear that, in fact, we

3    have a very general approach, a broad approach, to public

4    disclosure and administrative reports should be looked at in

5    the broadest sense of the term "report."

6          What does the word "report" mean?  According to the

7    Supreme Court in *Schindler,* it simply is anything that gives

8    information, anything that provides a notification.  Because

9    as the Court said, quote, "This broad ordinary meaning of

10   'report' is consistent with the generally broad scope of the

11   FDA's public disclosure bar."

12         So -- and just to point out, your Honor, in the wake

13   of the *Schindler* decision, district courts around the country

14   have found that databases, for example, of tax information --

15   the Southern District of New York in the United States, ex

16   rel. *Rossner* case, 739 F. Supp. 2d, 396, made very clear in

17   the wake of *Schindler* that even a searchable database of tax

18   information was a public disclosure and an administrative

19   report, and the Northern District of Illinois in the *Feingold*

20   case, 2011 WestLaw 1155250, made very clear that -- I'm sorry,

21   2001 -- statistical printouts from HCFA, which is the

22   forerunner to CMS, statistical printouts are administrative

23   reports.

24         So, what we would ask --

25         THE COURT:  Do these reports that you're showing me

1    have dates?

2           MR. LEFKOWITZ:  Yes.  All of these reports -- they

3    are reports at any point in time.  There are published --

4           THE COURT:  With the time --

5           MR. LEFKOWITZ:  Correct.

6           THE COURT:  -- shown on them?

7           MR. LEFKOWITZ:  And they tell you, in fact -- in

8    fact, there are -- they tell you the period that they are

9    covered.  Some of them are covered by a quarter.  Some of them

10   are covered by a year.  And when you look at the -- you can

11   tell exactly the timeframe that the submission and the

12   reimbursement was made.

13          THE COURT:  And the other question I have is the

14   prior printout showed just Zolpidem and here we have something

15   more specific, Zolpidem tartrate, also the size of the --

16          MR. LEFKOWITZ:  Correct.  So --

17          THE COURT:  -- drug.

18          How do I know that it's Zolpidem tartrate that is

19   shown on this chart and not Zolpidem --

20          MR. LEFKOWITZ:  Your Honor, because the drug data

21   utilization report is actually an online -- and without

22   printing out thousands of pages I couldn't bring it in.  I've

23   actually prepared for your Honor what is effectively a

24   demonstrative and I've tried to consolidate, but all of the

25   specific drugs that get reimbursed by name are listed on the

1    drug data reports and all of the drugs that either are

2    allowable or not you can determine from the Orange Book.

3          Now, I would simply make one final point on this and

4    then move on to her other argument, which is what she devotes

5    most of her briefing to.

6          I would suggest, your Honor, that unlike a response

7    to a FOIA request, which is simply just a collection of

8    documents which may or may not tell a particular story, these

9    are actually very clearly articulated databases that are

10   directly relevant to the very issues in this case.

11         Now, what does Ms. Conrad say in response to all of

12   this?  She says she deserves credit for piecing this alleged

13   fraud together.

14         But, your Honor, as the *Ondis* court made very clear,

15   and I'm quoting, "expertise that enables a relator to

16   understand the significance of publicly-disclosed information

17   without more is insufficient to qualify him as an original

18   source."

19         And, indeed, your Honor, the investigation in *Ondis*

20   could clearly have been deemed the same kind of archeology

21   that we have here.  There, the relator went through public

22   records and unearthed fraud that the government had not yet

23   discovered.

24         And, frankly, your Honor, here there's one other

25   critical document I want to show you.  In 2001, more than a

decade ago, CMS, HCFA actually it was called at the time, but

certainly Health and Human Services, put out a press release

in which they said, They have been working together with the

FDA to develop a system of identifying the non-drug products

that erroneously have NDC numbers associated with them.   To

that end, we will be matching active records on the FDA listed

and pending files to the active records on the Medicaid drug

rebate initiative to identify any records that do not match

and, therefore, do not meet the definition of covered

outpatient drug.

Your Honor, basically, the essential theory of Ms.

Conrad's case, the essential theory of her fraud, was

disclosed in a narrative, wholly apart from the fact that all

of the underlying data is publicly available, and I would

submit that what she did was precisely what she claims to have

done, a lot of archeology.

And in that respect, your Honor, I would submit that

her function is really in the nature of an expert witness for

the government, a consulting expert.   She was brought in

because of her expertise and she worked with the government,

and she may well have performed a valuable service, but that

valuable service is not the service that the statute rewards

with respect to being a relator.

One final case I just want to cite for you here.

It's an important D.C. Circuit case called *United States, ex*

1  *rel. Springfield vs. Quinn*, 14 F.3d 645, and the quote is

2  really directly on point, your Honor.  "There may be

3  situations in which all of the critical elements of fraud have

4  been publicly disclosed, but in a form not accessible to most

5  people.  For example, engineering blueprints on file with a

6  public agency.  Expertise in the field of engineering would

7  not in and of itself give a qui tam plaintiff the basis for

8  suit when all the material elements of fraud are publicly

9  available, though not readily comprehensible to non-experts."

10       Your Honor, that is precisely the situation we have

11  here.  So, on the jurisdictional point, I would submit, your

12  Honor, that she fails the public disclosure bar.

13       I want to just make two final points and then I'll

14  sit down.

15       One is, there's a lot of briefing about the statute

16  of limitations here and that would only be relevant if you

17  allow the case to proceed.  We have submitted that for most of

18  the defendants, the first unsealed complaint, which was in

19  2009, applies and, therefore, the statute of limitations

20  should bar any claims going back before 2003, six years

21  earlier.

22       There's a lot of briefing about Rule 15(c)(1)(A) and

23  discussion about how Judge Saris in the AWP cases, the

24  *Ven-A-Care* case, applied Rule 15(c)(1)(A).  Well, it's true

25  she did, but she did that without taking into account the fact

1     that the statute changed.  It actually changed after briefing

2     and argument in that case just shortly before she issued her

3     opinion, and I'm not sure what happened there, but the statute

4     changed and the statute now makes very, very clear that if the

5     -- that the relation that is only when the government is the

6     party.  That's the statute that was changed in May of 2009.

7     So, all of the relator's arguments about 15(c)(1)(A) are to no

8     avail.

9            And, indeed, although this Court has not yet had

10    occasion to address this issue since the amendments, the two

11    courts in the country that have looked at this, one in the

12    District of Columbia and one in Indiana, and we cite them,

13    2011 WestLaw 1791710 and the first is 608 F.3d 871, make very

14    clear that the 2000 amendments have held that the relation

15    back only applies to government.

16           And so, what that leaves is 15(c)(1)(B), and even

17    Judge Saris recognized in her opinion that under that

18    provision, notice is the lighthouse, and your Honor will

19    recall that you decided a case several years ago, *In Re*

20    *Exchange Securities Litigation*, where you held that fraud

21    claims based on an allegedly fraudulent SEC registration

22    statement were time barred under (c)(1)(B).  Why?  Because the

23    earlier complaint made no reference to the particular IPO at

24    issue.

25           Notice is the lighthouse under (c)(1)(B) and,

1    obviously, when you don't have notice because of the ceiling

2    of the prior complaints, you can't qualify.  Judge Saris was

3    deciding the case under a prior version of the False Claims

4    Act which doesn't apply here.

5            The last and final point I want to make has to do

6    with the cough-cold products, and it's a very small point,

7    your Honor.  In the Healthpoint case, the defendant was

8    arguing to you that you should rely on the Weiss list.  It's a

9    1987 list by the FDA of the status of various drugs subject to

10   the DESI review, and you said you're not going to take that

11   really into account because you said, and I'm quoting, "The

12   several FDA lists and categorizations do not, *a priori*,

13   establish that Granulex was eligible for reimbursement.  The

14   lists merely describe Granulex as not reviewed and, therefore,

15   may or may not be subject to DESI notices."

16           Your Honor, that's because if you look on the chart

17   here -- this is exactly from that Weiss list.  It described

18   that the category that we were talking about there was for a

19   tentative review that indicates that they may or may not be

20   subject to DESI.  And so, we understand why your Honor said

21   I'm not going to rely on that Weiss list for anything.  It

22   doesn't tell me.

23           But the category that we're talking about, Category A

24   on the Weiss list and, indeed, in particular Category A-11, if

25   you look at the next page, makes clear that Category A-11 are,

1  in fact, drugs that are under review by the cough-cold panel

2  and if they are under review by the cough-cold panel, then it

3  by law means no NOOH has been issued.

4       We will rest on our briefs for the rest of that

5  cough-cold discussion.  I just wanted to clarify because your

6  Healthpoint decision came out after the briefing.

7       THE COURT:  Thank you very much.

8       MR. LEFKOWITZ:  Thank you, your Honor.

9       THE COURT:  Mr. Roddy.

10      MR. RODDY:  Your Honor, I'd like to begin by putting

11 the case in context, because whether it's *Ondis* or *O'Keefe* or

12 any of the First Circuit or District Court cases that have

13 interpreted the bar, the key principle that the First Circuit

14 has emphasized is that the public disclosure bar has to be

15 applied within the larger context of the purpose of the False

16 Claims Act, and the purpose of the bar itself is to protect

17 the government from so-called parasitic opportunists who do

18 nothing more than copy information that's in the public domain

19 from a qualifying source, and that's something I'd like to

20 talk to you a little bit about, and then throw something at

21 the government asking for some money back without contributing

22 anything of value.

23      But here, the government, which is the entity that is

24 in the best position to determine whether the relator provided

25 anything of value whatsoever, has already acknowledged that

1       the relator has provided substantial value by paying for the

2       relator's share on the $85 million of settlement money that's

3       already recovered from the five defendants that have settled,

4       finally, and the government recently on a docket entry

5       indicated that it has reached a tentative settlement with

6       Healthpoint on its $90 million claim.  So, now the

7       defendant --

8                   THE COURT:  What is the effect on my decision of

9       that?

10                  MR. RODDY:  That indicates, your Honor, that the

11      entire premise of the overarching theme that the defendants

12      argue here that the public disclosure bar should prevent this

13      parasitic opportunist from pursuing her claim is a faulty

14      premise because she has clearly given the government something

15      of value --

16                  THE COURT:  Can I disagree with the government?

17                  MR. RODDY:  I'm sorry?

18                  THE COURT:  Can I disagree with the government?

19                  MR. RODDY:  Of course you can, your Honor.

20                  THE COURT:  Okay.

21                  MR. RODDY:  But in that context, I think that the

22      important element to keep in mind in interpreting every aspect

23      of the bar is that the government has already determined that

24      the bar shouldn't be invoked against Ms. Conrad.  Compare that

25      to the *Petite* case in which --

1          THE COURT:  But it's different drugs also, isn't it,

2     that may have had different databases?

3          MR. RODDY:  I don't believe that's correct, your

4     Honor.

5          THE COURT:  It's the same Zolpidem, and such?  I

6     thought each of the defendants had different drugs?

7          MR. RODDY:  Different drugs, but a single universal

8     theory, which is that the drugs that are listed are

9     unapproved.

10         THE COURT:  Yes, but are they all listed in the same

11    way?

12         MR. RODDY:  Well, that's actually my next point, your

13    Honor.

14         The way they're listed -- the X plus Y equals Z

15    analysis that the defendants are premising their argument on

16    requires that under the False Claims Act, the first indicator,

17    which is the state utilization data tables and -- which shows

18    the amounts that were paid, and the data tables that show the

19    actual drugs that were submitted to CMS as so-called approved

20    drugs, the notion that those data tables, which even the

21    defendants admit in their brief are unadorned data tables, are

22    reports.

23         Now, I notice that in the presentation they're titled

24    "reports," but that's not what CMS calls them.  The word

25    "reports" appears nowhere in any of those data tables.  And if

1    I could hand up, your Honor, the actual report from Exhibit 8,

2    it looks nothing like what you just saw.

3              (Attorney Roddy hands document to the Court.)

4              THE COURT:  Mr. Lefkowitz did tell us that he had

5    abstracted that line from the rest and highlighted it.

6              MR. RODDY:  I agree, your Honor.  I believe he also

7    added adornments, titles, colors, indicators.

8              There's no report, so to speak, which requires an

9    actual instruction manual as Exhibit 7 in the defendants'

10   submission.  In order to interpret that database, you need an

11   instruction manual that tells you what all these things

12   actually stand for.  So, with respect to the general notion of

13   what a report is, I think that that fails that test.

14             Secondly, the bar --

15             THE COURT:  What, then, is the standard?  I mean,

16   here I gather the relator was not intimately involved in the

17   fraud and then reported it.  She read whatever the reports or

18   non-reports were and deduced from what she read, based on her

19   understanding of these materials, that there might be an

20   issue.

21             Now, why is it not -- why is her report not a

22   public -- a prior public report, when anybody else reading the

23   same thing she read can also come to the same conclusion she

24   did?

25             MR. RODDY:  I think there are two responses to that,

1    your Honor.

2          But first I'd like to say that the False Claims Act

3    essentially has two categories of relators that it imposed to

4    a relator's award:  Someone who is inside the sausage factory

5    and sees the fraud and reports it and someone who doesn't have

6    that kind of direct information but obtains, as Ms. Conrad

7    did, not reports, not public disclosures, but information that

8    is gleamed from numerous sources, pieced together and put into

9    a package and presented to the U.S. Attorney.

10         There's a distinction -- and the cases all talk about

11   this *Springfield*, which defendants' counsel mentioned in

12   particular -- that there is a distinction to be made under the

13   bar between information that is in the public domain and

14   information contained in administrative reports as defined

15   under the statute.

16         Two points on that score, your Honor.  The first one

17   is that defendants say that *Schindler* and *Ondis* describe a

18   report as "anything that gives information."  That language

19   can only be properly construed as dicta taken out of context,

20   because *Schindler* talked about FOIA responses being reports

21   for a number of specific reasons.  I won't detail those now.

22         Similarly, *Ondis* looked at the procedure that the

23   government went through in responding to a FOIA request and

24   determined that that would properly be construed to be a

25   report, but a clock, a stop sign, an image of a graphic, all

1   of those things give information.  They are anything that

2   gives information.  They cannot be construed to be reports and

3   they certainly can't be construed to be reports, nor can these

4   unadorned data tables within the context of the FCA.

5        *Ondis* and *Duxbury* talk about the need to "avoid an

6   interpretation of the bar which is so overbroad as to prohibit

7   cases that are productive private enforcement suits.  We

8   eschewed reading an exclusion in *Rost* that did not have

9   textual support and resulted in discouraging productive

10  private enforcement."

11       Well, here, the operative language in the statute is

12  the information -- here we're talking about the transactions,

13  because there's no argument that allegations are disclosed --

14  that is disclosed in an administrative report.

15       So, disclosure is an affirmative representation and

16  disclosure in an administrative report means that -- for

17  example, the Orange Book and the NDC directory, which

18  defendants argue don't contain any indication that their drugs

19  are approved; therefore, they disclose that their drugs are

20  unapproved.

21       Well, the text of the statute requires an affirmative

22  representation and disclosure.  Defendants argue for a public

23  omissions bar.  If it's not there, then you must be able to

24  figure out that something else has happened.

25       Well, that may be true, but it's not within the

1    context of the statute's bar.  The statute is very limited and

2    exclusive, as the Court said in *Blank vs. Raytheon*, and if it

3    doesn't meet -- that is, the situation doesn't meet the exact

4    criteria set out in the statute, you can't properly deem such

5    an omission to be a disclosure contained in an administrative

6    report.

7            Now, the defendants claim that there are three cases

8    that held data files like CMS's to be administrative reports.

9    *Jamison* is the first one.  There the Court notes at the outset

10   the purpose of the bar is to prevent parasitic suits, and in

11   that case there were ten reports, an OIG fraud report among

12   them, and a number of other specific disclosures, affirmative

13   representations.  There are no unadorned data files in

14   *Jamison*.

15           *Rossner*, same thing, but *Rossner* found -- and this is

16   particularly interesting here.  On a Website with tax

17   histories, it de-qualifies a report because the Website is

18   easily navigable, and I challenge you to navigate that site,

19   and does not present raw unanalyzed data, which is exactly

20   what we have here.  Rather, it presents -- and the defendants

21   criticized the relator's notion that some synthesis is

22   necessary in order to produce natural reports.  It presents

23   synthesized tax benefit histories.  So, that doesn't really

24   seem to fit the bill here either.

25           And then, finally, there's *Feingold*, which notes at

1    the outset that the jurisdictional bar is raised only where

2    the transactions for the allegations of fraud, and it

3    highlights this, as opposed to mere innocuous information that

4    has been publicly disclosed.

5            So, again, there are no cases that defendants cite

6    that are anything like this case, and to stretch the

7    definition of "administrative report" beyond the boundaries

8    that have already been established by the First Circuit in

9    this circumstance would create the first case that we would be

10   aware of where the government has already recovered somewhere

11   in the vicinity of $100 million, paid the relator's share as a

12   result, and then the case was subsequently dismissed based on

13   the public disclosure bar, and this is where we get to the

14   intent of the bar.

15           What would be the purpose of the bar that is being

16   served there?  So that the defendants could get away with not

17   having to pay the kind of money that their six-settling

18   cohorts have already agreed to pay the government.  So, their

19   argument actually runs counter to the entire intent and

20   purpose of the FCA and it is in that context that we believe

21   all of these items have to be construed.

22           Finally, your Honor, just observe that the one case

23   that the defendants argue shows an omission to be equivalent

24   to a disclosure is the *Dunlevy* case out of the Third Circuit,

25   was subsequently abrogated by *Graham County*, a U.S. Supreme

1    Court case, and it's the only case we know of that talked

2    about an omission being tantamount to a disclosure.  The

3    omission was the last in a series of public -- unarguably,

4    public disclosures that reveal the allegations of fraud.

5             There is no such case in the First Circuit that

6    doesn't observe the plain text of the statute as I've just

7    articulated and, again, I reiterate that the First Circuit

8    does repeatedly emphasize the importance of observing the

9    bar's limits to avoid an overbroad meaning.

10            THE COURT:  Thank you.

11            MR. RODDY:  Thank you, your Honor.

12            MR. LEFKOWITZ:  May I just have two minutes?

13            THE COURT:  So, what is a report?

14            MR. LEFKOWITZ:  What was that?

15            THE COURT:  What is a report?

16            MR. LEFKOWITZ:  Your Honor, I'm glad you're starting

17   there because I want to just read to you from *Schindler*.  The

18   Court in *Schindler* started out by saying -- I took the wrong

19   page from *Schindler*.  I apologize, your Honor.

20            THE COURT:  It's okay.

21            MR. LEFKOWITZ:  Correct.

22            Here's what *Schindler* says:  "Kirk argues that

23   reading 'report' to mean 'something that gives information'

24   would subsume the other words in the phrase 'report, hearing,

25   audit, investigation.'

1          "We are not persuaded that we should adopt a

2     'different, somewhat special meaning' of 'report' over the

3     word's primary meaning.  Indeed, we have cautioned recently

4     against interpreting the public disclosure bar in a way

5     inconsistent with a plain reading of its text.  In *Graham*

6     *County* we rejected several arguments for construing the

7     statute narrowly, twice emphasizing that the sole

8     'touchstone,' the sole 'touchstone,' in the statutory text is

9     public disclosure."

10          Now, what is public disclosure?  Your Honor, on that

11     very database that counsel referred you to, what he didn't

12     show you was the first two pages of the database which have

13     the instructions, the key, and the key says this is how you

14     utilize it.  One period is period covered.  The next column is

15     the product FDA name.  The next column is the units

16     reimbursed, the number of prescriptions, the total amount

17     reimbursed under Medicaid.  Yes, it is a comprehensive data

18     file and as in many of these cases, it does require someone to

19     take some effort, but the key is it is publicly disclosed.

20          And I'm not suggesting that the relator didn't

21     provide assistance to the government in these cases that

22     settled, but as your Honor pointed out, those were different

23     cases involving different products and, indeed, in part,

24     involving different theories.

25          Here we have a theory that doesn't have to do with a

1    drug that was very specifically identified on a federal

2    register notice as ineligible for funding which, in fact, the

3    party tried to get funding for.  We're dealing with situations

4    where they're alleging that Medicaid can never reimburse for

5    anything that's not a covered outpatient drug, and we know,

6    your Honor, that that's not the case because the statute says

7    Medicaid must provide for home health services, and we know

8    that the CMS has said certain types of over-the-counter

9    dietary supplements, while they can't be eligible under one

10   part of Medicaid, can be eligible for another part.  There are

11   ambiguities here throughout the statute, but the key is that

12   the elements in this case are not the same as the elements in

13   that case.

14        And, your Honor, no one is suggesting here that if

15   this case is dismissed, and there is, in fact, a fraud that

16   the government is troubled by, they can't bring a case or that

17   a true original source, a true whistle-blower, couldn't bring

18   a case.

19        The question is simply whether the statute is

20   intended to reward people who basically read a roadmap from a

21   government press release in 2001, go out -- and because they

22   have expertise, because they've worked in the government

23   healthcare agency, go out and collect this data and then bring

24   a case.  They may have helped uncover frauds that the

25   government decided to pursue.  That's fine.  But the

1       government has not decided to pursue this.

2              And, finally, the last point, with respect to

3       counsel's argument that, Well, what we're arguing for is a

4       public omissions bar, not a public disclosure.  The fact is,

5       if you want to know what a lawful or an unlawful drug is, you

6       look at the list of lawful drugs.

7              I don't think I've ever used Latin in an argument,

8       but I think the phrase is *expressio unius*, if I remember from

9       30 years ago.  That's how you know whether a drug is not

10      lawful.  You don't have anywhere in the world a listing of

11      everything that is not a lawful drug.

12             Thank you, your Honor.

13             THE COURT:  Thank you.

14             Does anybody else want to be heard?  Do you?

15             MR. DOVE:  Yes, your Honor.

16             THE COURT:  Go ahead.

17             MR. DOVE:  Good afternoon, your Honor.

18             My name is Ron Dove and I represent defendant

19      Healthpoint.  I just have a few minutes on this.

20             Your Honor, Healthpoint joins in the motion that Mr.

21      Lefkowitz just argued, but we also separately move to dismiss

22      the relator's claims as to two Healthpoint drugs, Panafil and

23      Acu-Dyne.

24             The relator claims that Healthpoint violated the

25      False Claims Act by misrepresenting that Panafil and Acu-Dyne

were covered outpatient drugs under Medicaid when neither drug

had been approved by the FDA, but a drug does not have to be

approved by the FDA to be reimbursed by Medicaid.  The

Medicaid statute makes clear that a particular drug can

qualify as a, quote, "covered outpatient drug" if, first, the

drug was commercially used or sold in the United States before

October 10th, 1962, or is identical --

THE COURT:  Before 1962?

MR. DOVE:  Before October 10th, 1962, or is

identical, similar or related to such a drug.  And, second,

the drug has not been the subject of a DESI notice or new drug

determination by the FDA.

And, indeed, your Honor recognized this in its

earlier decision involving the product Xenaderm where you

stated that "drugs not approved by the FDA are not

categorically precluded from Medicaid and Medicare

reimbursement."

So, under this regulatory definition, it was

reasonable and certainly not frivolous or reckless for

Healthpoint to have determined that Panafil and Acu-Dyne were

IRS to the pre-1962 drug Panafil.

And why is this?  There's two things I want to

highlight, your Honor.  First, the relator concedes that a

form of Panafil was introduced to the market on or before 1956

by another company called Rystan and that puts it in the

1   pre-1962 legacy drug category.

2        And then second, and most importantly, your Honor, it

3   is undisputed that the FDA did not determine Panafil or

4   Acu-Dyne to be new drugs until September 2008, after the

5   period for which the relator seeks relief, and that, your

6   Honor, is the biggest difference between this motion and the

7   one the Court decided earlier with regard to Xenaderm, which

8   was the case in which the United States intervened.  The

9   United States has not intervened against these two drugs.

10       The Court may recall that in that case there were two

11  FDA notices from the 1970s that the government argued put

12  Healthpoint on notice that Xenaderm was less than effective

13  and, thus, not subject to reimbursement.

14       You know, we don't agree with that, but the fact that

15  Xenaderm was arguably subject to prior DESI notices was a key

16  factor in the Court's decision in that case.

17       We're in contrast in this case.  As Mr. Lefkowitz

18  said -- you know, pointed to the differences in this case.

19  The relator has pointed to no such prior notices, none

20  whatsoever with regard to Panafil and Acu-Dyne.

21       So, the bottom line, your Honor, is that the

22  relator's claim that Panafil and Acu-Dyne were not covered

23  outpatient drugs under the Medicaid statute is just simply

24  wrong as a matter of law, and the relator has also not alleged

25  any facts that would suggest that Healthpoint intentionally

1    did anything wrong or acted with reckless disregard, which, as

2    you know, is the minimal level of scienter under the False

3    Claims Act.

4           So, for these reasons, your Honor, and those that we

5    laid out in detail in the briefs -- I won't rehash those -- we

6    respectfully request that the Court grant Healthpoint's motion

7    to dismiss.  Thank you.

8           THE COURT:  Thank you.

9           MR. RODDY:  Your Honor, there are two points that

10   Healthpoint is essentially arguing here.  I'd like to take the

11   second one first, and that is the notion that it acted

12   reasonably with respect to looking at the DESI or non-DESI

13   circumstances of the drugs that were being marketed.  I

14   believe that that has already been determined adversely to

15   them in your ruling in the original Healthpoint motion.

16          Secondarily, the main point that Healthpoint tries to

17   argue is that Panafil and Acu-Dyne are identical, related or

18   similar to the previously-marketed drugs.  Two things on that

19   score.

20          If they were identical, related or similar, it's

21   curious that in 2004 and in 2006 Healthpoint marketed the

22   Acu-Dyne spray and the Panafil spray as, I quote from their

23   press release, "a new pump stray delivery system in which a

24   patent application is pending."

25          As a matter of law, a brand-new drug which the

1    proponent is seeking a patent for cannot be identical, related

2    or similar to a drug that was marketed 30 years prior.

3          Secondarily, we do not concede that these drugs were

4    IRS in any respect to Panafil, the original 1956 Rystan

5    Panafil or the Panafil-White, and on Panafil-White the

6    determinative marker is October 10th, 1962.

7          Healthpoint says that their -- this particular drug

8    was introduced around 1962.  They submitted I believe in their

9    materials, which I believe were inappropriate, anyway, because

10   this is a 12(b)(6) motion to dismiss, a PDR from 1964, and

11   just for the Court's reference and to take judicial notice,

12   there's a PDR from 1962 in which that particular drug does not

13   appear.  So, it is, at best, a question of fact whether that

14   particular drug was even marketed prior to the deadline, and I

15   believe that also with respect to the spray elements of the

16   two, of Panafil and Acu-Dyne, it as a matter of law cannot be

17   stated that they're identical, related and similar to the

18   prior drugs if they are marketed as new drugs in which a

19   patent application is pending.  Thank you.

20         THE COURT:  Thank you.  Anybody else?

21         (No response.)

22         THE COURT:  Well, I thank you all.  I hope the

23   audience had a good time.

24         MR. LEFKOWITZ:  Thank you, your Honor.

25         (Adjourned, 3:24 p.m.)

```
1                    C E R T I F I C A T E

2            I, Catherine A. Handel, Official Court Reporter of the

3    United States District Court, do hereby certify that the

4    foregoing transcript, from Page 1 to Page 39, constitutes to the

5    best of my skill and ability a true and accurate transcription of

6    my stenotype notes taken in the matter of Civil Action No.

7    02-11738-RWZ, United States of America, ex rel Constance A.

8    Conrad versus Abbott Laboratories, Inc., et al.

9

10
     November 16, 2012      /s/Catherine A. Handel
11   Date                   Catherine A. RPR-CM, CRR

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```